UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**BIG SPRINGS REALTY LLC**,<br><br>Debtor. | Case No. **09-61079-7** |
| **DARCY M. CRUM**,<br><br>Plaintiff.<br><br>-vs-<br><br>**TIMOTHY L BLIXSETH**,<br><br>Defendant. | Adv No. **09-00065** |

## MEMORANDUM of DECISION

At Butte in said District this 18th day of March, 2010.

Pending in this Adversary Proceeding are Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction filed November 20, 2009, at docket entry no. 49, and Plaintiff's Application for Prejudgment Writ of Attachment filed January 27, 2010, at docket entry no. 130. A hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction was held December 8, 2009, in Butte and a hearing on Plaintiff's Application for Prejudgment Writ of Attachment was held February 22, 2010, in Missoula. The Plaintiff was represented at the hearings by Robert K. Baldwin and Trent M. Gardner of Bozeman, Montana. The Defendant

Created by Neevia Document Converter trial version http://www.neevia.com

was represented at the hearings by Daniel D. Manson of Butte, Montana and Philip H. Stillman of Olivehain, California.

In the pending Motion for Temporary Restraining Order and Preliminary Injunction, the Plaintiff seeks an order preventing the Defendant from transferring, encumbering, conveying, or disposing of any assets whatsoever until further order of this Court. Also in such Motion, Plaintiff moves the Court for sanctions for contempt of court and discovery violations. Given the events that have transpired in this case, Plaintiff's Motion for Temporary Restraining Order and request for sanctions are moot. The only matter still viable is Plaintiff's Motion for Preliminary Injunction.

In the Application for Prejudgment Writ of Attachment, the Plaintiff/Trustee seeks to attach the Defendant's distributional interest in Desert Ranch, LLLP, a Nevada Limited Liability Limited Partnership. To accomplish such, Plaintiff requests that the Court issue a writ to the United States Marshal in Montana, for Timothy L. Blixseth, as manager of Desert Ranch Management, LLC, which is the General Partner of Desert Ranch, LLLP. In the alternative, Plaintiff requests that the Court order Defendant to bring all evidence of his ownership in Desert Ranch, LLLP to Montana so the Sheriff can take possession of such papers.

BACKGROUND

The Defendant in this Adversary Proceeding, Timothy L. Blixseth ("Blixseth") and his former spouse, Edra Blixseth ("Edra"), were the founders of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, which limited liability companies are referred to generally by this Court as the Yellowstone Club entities. Blixseth and Edra were also the founders of Yellowstone Club

Created by Neevia Document Converter trial version http://www.neevia.com

World, LLC, Big Springs Realty, LLC and BLX Group, Inc., f/k/a Blixseth Group, Inc. or BGI. Blixseth was in control of all the aforementioned entities until August of 2008, when Blixseth turned ownership and control of said entities over to Edra pursuant to a Marital Settlement Agreement. Shortly thereafter, on November 10, 2008, Edra caused the Yellowstone Club entities to seek protection under Chapter 11 of the Bankruptcy Code. In addition, an involuntary bankruptcy petition was filed against Yellowstone Club World, LLC on January 25, 2009, Big Springs Realty, LLC filed a voluntary Chapter 7 bankruptcy petition on June 5, 2009, and an involuntary Chapter 11 bankruptcy petition was filed against BLX Group, Inc. on September 21, 2009. Finally, Edra personally sought protection under Chapter 11 of the Bankruptcy Code on March 26, 2009. Edra's bankruptcy case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009.

The Yellowstone Club bankruptcies, *In re Yellowstone Mountain Club, LLC* (Case No. 08-61570), *In re Yellowstone Development, LLC* (Case No. 08-61571), *In re Big Sky Ridge, LLC* (Case No. 08-61572), and *In re Yellowstone Club Construction Company, LLC* (Case No. 08-61573), have generated an incredible amount of litigation, including a 9 day trial stemming from a $375 million loan that the Yellowstone Club entities obtained from Credit Suisse, and Blixseth's use of over $200 million of the Credit Suisse loan proceeds for his own personal use. Similarly, the Trustee in the case of cases of *In re Yellowstone Club World, LLC* (Case No. 09-60061), filed an action against Blixseth alleging that Blixseth owes Yellowstone Club World, LLC at least $2.8 million for inappropriate transfers from Yellowstone Club World, LLC to Blixseth's personal accounts.

In the instant Adversary Proceeding, Plaintiff alleges that Blixseth took in excess of $5

Created by Neevia Document Converter trial version http://www.neevia.com

million out of Big Springs Realty, LLC ("BSR") from August of 2007 through June of 2008, which precluded BSR from paying its other obligations as they became due. BSR's Historical Detailed Trial Balance shows that during the period of time referenced by the Plaintiff, Blixseth took the total sum of $3,635,129.39 out of the Debtor entity on the following dates:

| Date | Amount |
| --- | --- |
| August 13, 2007 | $200,000.00 |
| August 17, 2007 | $100,000.00 |
| September 14, 2007 | $250,015.00 |
| September 18, 2007 | $500,015.00 |
| November 14, 2007 | $200,015.00 |
| December 3, 2007 | $250,000.00 |
| December 5, 2007 | $150,000.00 |
| December 14, 2007 | $240,000.00 |
| March 26, 2008 | $100,000.00 |
| April 2, 2008 | $250,000.00 |
| April 18, 2008 | $250,000.00 |
| April 28, 2008 | $200,000.00 |
| May 29, 2008 | $300,000.00 |
| June 11, 2008 | $ 95,936.21 |
| June 11, 2008 | $ 49,148.18 |
| June 27, 2008 | $500,000.00 |

BSR's Historical Detailed Trial Balance also shows that Blixseth took distributions from BSR of $1,433,030.00 between January 16, 2008, and February 22, 2008.

On January 31, 2001, Charles Callendar ("Callendar") went to work for Blixseth and Edra as the Director of Marketing and Sales at the Yellowstone Club. In a deposition taken November 11, 2009, Callendar explained that in 2005, Blixseth decided to split the marketing and sales departments at the Yellowstone Club, placing the sales department into the Debtor entity. However, the sales department at the Yellowstone Club did not change its office, letterhead or business cards. According to Callendar, the only change he noticed was the addition of a signature line for BSR on resale listings and resale purchase and sale agreements. Because sales

Created by Neevia Document Converter trial version http://www.neevia.com

at the Yellowstone Club had grown from $10 million in 2001 to somewhere in the neighborhood of $150 million in 2005, Callendar believes that Blixseth formed Big Springs Realty, LLC for the purpose of spreading his risk of liability. In Callendar's words, Big Springs Realty, LLC "became a private bank account for someone, for Mr. Blixseth, that was segregated from other accounts at the Club." Callendar Deposition, p. 25.

With respect to the time frame at issue in this proceeding and consistent with evidence presented to this Court in other Yellowstone Club cases, Callendar stated in his deposition that Blixseth was negotiating to sell the Yellowstone Club. The anticipated sale to CrossHarbor Capital Partners was scheduled to close in March of 2008. To that end, Callendar entered into a three and one-half month employment agreement with Big Springs Realty, LLC, d/b/a Yellowstone Sales in January of 2008 that was scheduled to terminate on April 15, 2008. During those 3½ months, Callendar was directed by Blixseth "to do whatever was necessary to provide information and back-up and detail to the due diligence team for CrossHarbor [the prospective purchaser] and all of their employees, to do anything to ensure this contract or this particular sale went through." Callendar Deposition, p. 29. The sale fell through and Blixseth later extended Callendar's employment agreement to October 15, 2008.

Proof of Claim No. 194 filed by Big Springs Realty, LLC in Yellowstone Development, LLC's bankruptcy case reflects a claim by Big Springs Realty, LLC of $1,772,562.00 for "wages/commissions" earned between January 10, 2008, and July 25, 2008, that were not paid as of November 10, 2008, when Yellowstone Development, LLC filed its Chapter 11 bankruptcy petition. According to Callendar, "bonuses" from the sale of property were generally paid within 2 weeks, and generally no more than 30 days from the date a property closed escrow. However,

Created by Neevia Document Converter trial version http://www.neevia.com

with respect to the bonuses reflected in Proof of Claim No. 194, Callendar explained:

> Mr. Blixseth came to us in the, I believe it was in February of 2008 and explained that with the impending closing, that he was having to move funds to make arrangements within the Club to pay certain things which needed to be paid in anticipation of the closing, and to cover costs that they needed for ongoing operation, and that he asked if we could postpone our bonus payments for a couple of weeks so that, and that we could be paid and caught up at the next normal bonus payment milestone.
>
> * * *
>
> And then the next milestone came for us to ask for the bonuses, and I asked Casey, you know, can we make the payment: And she needed to have a transfer done to – from one account to another, which was done by Mr. Blixseth or by his instructions, and she notified me that in fact he wouldn't agree to the transfer of the funds at that time.
>
> And so I talked to Mr. Blixseth, and I said Tim, why are we not – why are you not allowing this transfer to take place? We agreed to postpone it for two weeks. And he said, well, I still need these funds for other issues relating to the closing, don't worry, we will make sure you are all paid when we close in March.
>
> * * *
>
> And this dialogue continued. Then when the – CrossHarbor then asked for an extension of the closing from mid March to mid – well, the 1st of April, I don't recall, or the 15th of April.
>
> Then I would ask again and he said, well, Charlie, the closing has been put off so your payment of bonuses will be put off until that time.

Callendar Deposition, p. 77-79.

After sale of the Yellowstone Club to CrossHarbor fell through, Blixseth entered into a Marital Settlement Agreement ("MSA") with Edra in June of 2008 whereby Edra would receive ownership and control of BSR. At that time, Blixseth represented that BSR had cash on hand of at least $500,000.00. Even though Blixseth entered into the MSA in June, he did not transfer ownership and control of BSR to Edra until August 13, 2008. In the period of time between

Created by Neevia Document Converter trial version http://www.neevia.com

when Blixseth signed the MSA in June of 2008 and transferred ownership and control to Edra on August 13, 2008, Blixseth transferred to himself $10,000.00 on July 29, $5,000.00 on July 30, $10,000.00 on August 6, and $64,000.00 on August 12, leaving BSR with a balance of $2,212.57 in its bank account on August 12, 2008. By the end of the following day, August 13, 2008, BSR's bank account had a negative balance of 6,252.58.

At a trial in another matter, Blixseth and his counsel admitted that Blixseth transferred the bulk of his assets to Desert Ranch, LLLP for estate planning purposes and to insulate Blixseth from his creditors. As for evidence in this case, Plaintiff states in her Affidavit dated January 22, 2010, in discussing Blixseth's individual investment account with D.A. Davidson & Co.: "As of October 31, 2009, the account held $925,000 in bonds and had a margin balance [for loans] outstanding of $[648,005.47], for a net value of $276,994.53. DAD Account Statements, p.1 (Exhibit 6). However, as of November 30, 2009, the statements reveal that the $925,000 in bonds are gone and the net value is a negative $649,456.28." Darcy Crum Affidavit, p.4. The foregoing is confirmed by Blixseth's account statements from D.A. Davidson & Co.

1.  Preliminary Injunction

> When determining whether entry of a preliminary injunction is appropriate, this Court
>
> balances the plaintiff's likelihood of success against the relative hardship to the parties. To receive a preliminary injunction, [a plaintiff is] required to show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests.

*Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) (citations omitted). The first requirement is a demonstration of a likelihood of success on the merits. This

Created by Neevia Document Converter trial version http://www.neevia.com

is not a high burden. Instead, "[t]o establish a substantial likelihood of success on the merits, Plaintiff must show 'a fair chance of success.'" *Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). Here, Plaintiff asserts fraudulent transfer and other claims related to Blixseth's receipt of substantial money from BSR in the years before its bankruptcy, while he was the sole member.

Blixseth argues in opposition to the Plaintiff's Motion that BSR "was merely a sales company that earned commissions on each sale, paid those commissions to its sales agents and distributed its share to its sole managing member. [BSR] was never insolvent during any time that Mr. Blixseth was its sole managing member, always paid its bills, and its pending sales were always sufficient to cover its obligations." Blixseth's Opposition to Motion for Prejudgment Writ of Attachment, pp. 20-21. BSR's records show that Blixseth took over $5 million in distributions out of BSR between August of 2007 and June of 2008. During that same period of time, Blixseth was informing Callander and the other BSR salespeople that they would not be receiving their "bonuses" because BSR was short on funds. BSR's bank statements clearly show that Blixseth had drained all the cash out of his "veritable cash cow," by August 12, 2008.

Blixseth attempts to shift the focus from himself by arguing that Callendar, as the broker, was responsible for paying the real estate agents at BSR. Such argument is disingenuous. According to Callendar, he had no authority over any of BSR's bank accounts. Rather, that control was with Blixseth. Blixseth also makes the crabbed argument that BSR had at least $500,000 in its account in June of 2008 with which to pay outstanding commissions. While BSR may have had $500,000 in its bank account at some point in time in June of 2008, BSR's July

Created by Neevia Document Converter trial version http://www.neevia.com

2008 bank statement shows that on June 30, 2008, just 3 days after Blixseth took a $500,000 distribution, that BSR was left with a mere $177.67 in its bank account. Blixseth seeks to convince this Court that the Plaintiff will never prove insolvency in this case arguing that "[a]t no time between June 6, 2007 and June 30, 2008 was BSR insolvent, or were its assets unreasonably small when compared to expected liabilities." Blixseth's Opposition to Motion for Prejudgment Writ of Attachment, pp. 6-7. Blixseth's argument is wholly inconsistent with the record before the Court. Blixseth left BSR with $177.67 on June 30, 2008, when it owed in excess of $1 million of bonuses to its real estate agents.

Turning from the facts to the law, Blixseth rejects *Focus Media* as being "light years from this case." However, this Court finds *Focus Media* remarkably similar to the instant case. In *Focus Media*, the court held that evidence showing that a sole shareholder made away with a debtor's funds in the past, "raises the specter of irreparable harm to the bankruptcy estate if these funds are not frozen." *Id.*; *see also FTC v. Affordable Medai, LLC*, 179 F.3d 1228, 1236-37 (9th Cir. 1999) (concluding that given petitioners' history of spiriting away funds, the district court's finding that they were likely to dissipate assets was not clearly erroneous); and *FDIC v. Garner*, 125 F.3d 1272, 1279-80 (9th Cir. 1997) (giving "substantial deference" to lower court's finding that there was "at least a possibility" of dissipation of assets absent an asset-freezing injunction, and consequently concluding that the possibility of irreparable injury had been adequately demonstrated).

After summarily dismissing *Focus Media*, Blixseth argues that this Court must reject Plaintiff's request for a preliminary injunction under *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 323, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999).

9

Created by Neevia Document Converter trial version http://www.neevia.com

Blixseth's reliance on *Grupo Mexicano* is misplaced. In *Grupo Mexicano*, the United States Supreme Court held a court did not have the power to issue a preliminary injunction freezing assets in an action for money damages based upon a breach of contract claim where no lien or equitable interest was claimed. *Grupo Mexicano*, 527 U.S. at 310. However, the Supreme Court explicitly excepted bankruptcy law and the law of fraudulent conveyances from the inappropriate exercise of equitable power at issue. *Id*. at 322. For the reasons just discussed, the Ninth Circuit Court of Appeals in *Focus Media* concluded that *Grupo Mexicano* did not bar the issuance of a preliminary injunction where the plaintiff in an adversary proceeding alleges fraudulent conveyance or other equitable causes of action. *Focus Media*, 387 F.3d at 1084-86.

The Plaintiff's instant action was instituted as part of an ongoing bankruptcy proceeding, a quintessentially equitable proceeding. The Plaintiff raises a fraudulent conveyance claim along with other closely related claims. The Plaintiff's request for an equitable remedy, namely a preliminary injunction, is appropriate given the claims alleged and is not undermined by *Grupo Mexicano*. To quote Blixseth's words, there is, in this case, "tangible and substantial evidence of gross financial conduct" by Blixseth. Blixseth's Opposition to Motion for Prejudgment Writ of Attachment, p.32.

There is also substantial evidence in this case that Plaintiff is at substantial risk of Blixseth dissipating and transferring assets. Blixseth used BSR as his personal piggy bank and stripped it of funds it needed to pay its obligations and now it appears that Blixseth is moving and transferring assets in an effort to protect such assets from potential judgments. For example, admissible evidence shows that Blixseth disposed of $925,000 in municipal bonds in November of 2009. This evidence, coupled with Blixseth's own testimony that he has transferred

Created by Neevia Document Converter trial version http://www.neevia.com

substantially all his assets into or under the umbrella of Desert Ranch, LLLP, a Nevada entity, convinces this Court that a preliminary injunction is necessary to prevent any further dissipation of Blixseth's assets.

Blixseth, relying on *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994), next argues that "Fed.R.Civ.P. 65(c) requires that the applicant for a preliminary injunction post security for the payment of costs and damages that may be incurred or suffered by any party 'wrongfully enjoined.'" Blixseth's argument is misplaced. The Plaintiff/Trustee in this action is not required to post a bond because Federal Rule of Bankruptcy Procedure 7065 does not require a trustee to post a bond as a condition of obtaining an injunction: "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a . . . preliminary injunction may be issued on application of a . . . trustee . . . without compliance with Rule 65(c)."

  2. Application for Prejudgment Writ of Attachment.

In the pending Application, the Plaintiff seeks, pursuant to Rule 7064, F.R.B.P., F.R.Civ.P. 64, MONT. CODE ANN. ("MCA") §§ 31-2-327, *et seq*. and MCA §§ 27-18-101 *et seq*., a writ of attachment under the Montana Uniform Fraudulent Transfers Act, attaching the distributional interest of the 98% Limited Partner stake of Blixseth in Desert Ranch, LLLP. Counsel for Plaintiff contends that the Application is supported by the exhibits attached to Plaintiff's Application, the Affidavit of Darcy Crum and the exhibits thereto, and the entire record in the case.

In accordance with Federal Rule of Bankruptcy Procedure 7064, F.R.Civ.P. 64 applies in adversary proceedings. Rule 64 provides:

  (a) Remedies Under State Law--In General. At the commencement of and

Created by Neevia Document Converter trial version http://www.neevia.com

> throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies.
>
> (b) Specific Kinds of Remedies. The remedies available under this rule include the following--however designated and regardless of whether state procedure requires an independent action:
>
> * * *
>
> • attachment[.]

As is evident from Rule 64, the remedy of attachment in bankruptcy is governed by the law of the state in which the bankruptcy court sits.

Montana's writ of attachment statutes are found at MCA § 27-18-101, *et seq*. Pursuant to § 27-18-205, MCA:

> A judge of a court having jurisdiction of the cause may issue a writ of attachment when:
>
> (1) the judge has received the affidavit described in 27-18-202;
>
> (2) the judge has approved the undertaking required in 27-18-204; and
>
> (3) the party seeking attachment has made a prima facie showing:
>
> * * *
>
> (b) in the case of personal property:
>
> > (i) of the right to attachment and the necessity for seizure at a show cause hearing before the court with at least 3 days' notice to the defendant; if the defendant cannot be found for personal service, notice must be posted on the property and in three public places in the county where the property is located; or
> >
> > (ii) of the right to attachment and the necessity for seizure and that the delay caused by notice and a hearing would seriously impair the remedy sought by the party seeking possession. Evidence of the

Created by Neevia Document Converter trial version http://www.neevia.com

> impairment must be presented in open court, and the court shall set forth with specificity the reasons why the delay would seriously impair the remedy sought by the person seeking attachment.

After reviewing the record, the Court agrees with the Plaintiff that the Affidavit of Darcy Crum satisfies the requirements of MCA §§ 27-18-205(1) and 27-18-202. The Plaintiff has also made the prima facie showing required by MCA § 27-18-205(3)(b).

The Plaintiff requests that the Court waive the written undertaking required by §§ 27-18-205(2) and 27-18-204. Section § 27-18-204 is not permissive, but instead requires that "[b]efore issuing the writ, the court *shall* require a written undertaking[.]" In this case, the appropriate undertaking is $20,000.00. As explained in the statute, the purpose of the undertaking is to pay the defendant's costs that may be awarded and all damages sustained by the defendant in the event the Court finally decides that the plaintiff was not entitled to an attachment. Because attachment is a "harsh remedy," orders of attachment must be granted in strict accordance with the authorizing statute. Therefore, Plaintiff's request that this Court waive any undertaking requirement must be denied.

The Court's function in a prejudgment remedy dispute is not to provide a final ruling on the merits, but to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. In this case, the Plaintiff has demonstrated that there is probable cause to believe that a judgement will be rendered in favor of the Plaintiff after a trial on the merits. However, this does not end the inquiry in this case.

Blixseth previously had substantial assets in Montana and has transferred those assets to either Desert Ranch, LLLP or entities owned by Desert Ranch, LLLP. Arguing that this Court can attach assets nationwide, the Plaintiff seeks to attach Blixseth's 98% Limited Partner interest

Created by Neevia Document Converter trial version http://www.neevia.com

in Desert Ranch, LLLP. Plaintiff concedes that a prejudgment attachment order issued by a Montana state court is not valid in foreign states, but, relying on *American Freight Systems, Inc. v. Temperature Systems, Inc. (In re American Freight Systems, Inc.)*, 173 B.R. 739 (Bankr. D.Kan. 1994), argues that nationwide service of a writ of attachment is permitted under Rules 7064 and 7069, F.R.B.P., by Rule 7004(d). Blixseth counters that *Paul H. Aschkar & Company v. Curtis*, 327 F.2d 306 (9th Cir. 1964), is controlling and precludes judicial assertion of extraterritorial attachment jurisdiction.

As Blixseth correctly notes, *American Freight Systems* was a postjudgment case that addressed whether garnishments issued by a bankruptcy court in Kansas were effective outside the State of Kansas under F.R.B.P. 7069. 173 B.R. at 741. The court in *American Freight Systems* concluded that the term "federal statute" in F.R.Civ.P. 69 included Federal rules of procedure and thus, F.R.B.P. 7004(d) superseded the requirements for service of process under Kansas law:

> In a case also involving the enforcement of a federal court judgment through a garnishment done according to Kansas procedure, the Tenth Circuit held that federal rules of procedure have the force of a statute and therefore control the manner of service of process to enforce a judgment. *Rumsey v. George E. Failing Co.*, 333 F.2d 960, 962 (10th Cir.1964); *see also* 12 WRIGHT & MILLER, FED.PRAC. & PRO.CIVIL, § 3012 at 69 (1973) ( agreeing that "any statute" in Rule 69 includes federal rules of procedure). Consequently, this Court is convinced that Rule 7004(d) supersedes the Kansas procedure for service of process and authorizes nationwide service of a garnishment order issued by a bankruptcy court located in Kansas.

*Id*. at 742-43. The Tenth Circuit Court of Appeals in *Rumsey* held that manner of service under F.R.Civ.P. 69 was governed by F.R.Civ.P. 5(b) and not Kansas law. The Court in *Rumsey* relied heavily on Mr. Moore's work on Federal Practice and concluded that "in supplementary

14

Created by Neevia Document Converter trial version http://www.neevia.com

proceedings the Federal Rules of Civil Procedure with respect to the method of service and to the person who may make the service control, rather than general provisions of state practice and procedure, prescribed by state statutes, which do not deal specifically with practice and procedure in supplementary proceedings." *Rumsey*, 333 F.2d at 962.

The Seventh Circuit Court of Appeals in *Resolution Trust Corporation v. Ruggiero*, 994 F.2d 1221 (7th Cir. 1993), criticized *Rumsey's* ruling that federal rules have the force of statute:

> Rule 69(a) provides that in the absence of an applicable federal statute the procedure in supplementary proceedings to execute a federal court's judgment shall be that of the forum state. The draftsmen of the rule, rather than design a format for supplementary proceedings-with stages, deadlines, and other forms, powers, and limitations specially adapted to the needs of such proceedings-decided (perhaps in the hope that such proceedings would rarely be necessary) to borrow the format employed in the courts of the forum state. Though authority is sparse we doubt that they meant to borrow the entire procedural law of the state, so that in supplementary proceedings in federal district courts in Illinois the judge would apply the Illinois rules of civil procedure and of evidence rather than the counterpart federal rules. 12 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3012 at p. 63 (1973). But neither do we agree with the Tenth Circuit, *see Oklahoma Radio Associates v. FDIC*, 969 F.2d 940, 942 (10th Cir.1992); *Rumsey v. George E. Failing Co.*, 333 F.2d 960 (10th Cir.1964); also 12 WRIGHT & MILLER, *supra*, § 3012 at p. 63, that the judge must apply the federal rules because they have the force of statute. The reference in Rule 69(a) to applicable federal statutes appears to refer to federal statutes expressly governing execution, *see* Note of Advisory Committee on Rule 69(a), a category that would presumably comprehend any rule regulating execution, such as Rule 62(a), but not the rules of procedure or of evidence in gross.

*Ruggiero*, 994 F.2d at 1226. Like *American Freight Systems* and *Rumsey*, *Ruggiero* is a postjudgment case dealing with supplementary proceedings under Rule 69. As explained in *Ruggiero*, "[p]roceedings to enforce judgments are meant to be swift, cheap and informal." *Id.*

Prejudgment seizure of property under F.R.Civ.P. 64 is vastly different than the "swift, cheap and informal" enforcement of a judgment under Rule 69. Moreover, this Court is reluctant

Created by Neevia Document Converter trial version http://www.neevia.com

to conclude, as the courts did in *American Freight Systems* and *Rumsey*, two cases which rely heavily on Wright and Miller's FEDERAL PRACTICE AND PROCEDURE, that the term "federal statute" includes federal rules of procedure under Rule 64 because 11A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2933 at pp14-16, gives examples of governing "federal statutes" under Rule 64: "For examples of this kind, see 28 U.S.C.A. §§ 1609-1611 (foreign sovereign immune from attachment unless immunity is waived), 28 U.S.C.A. § 2007 (imprisonment for debt), 28 U.S.C.A. § 2405 (garnishment by the United States), and 28 U.S.C.A. § 2463 (property taken under revenue laws not subject to replevin). The Soldiers' and Sailors' Relief Act also provide for vacation or stay, under certain circumstances, of an attachment or garnishment."

Plaintiff maintains that the ruling of the Ninth Circuit Court of Appeals in *Aschkar* is limited in its application. While that may be so, this Court is persuaded by the reasoning in *Aschkar*:

> [T]he granting of district court jurisdiction over property and debtors foreign to the district is a serious and debatable matter upon which the courts should not lightly proceed to judge what Congress would have done had it considered the question. This is particularly so, we feel, with respect to attachment- a remedy subject to abuse and any extension of which is controversial. Even more particularly is this so where, as here, the extension sought would permit the law of the forum state to be imposed abroad with respect to matters upon which state laws are greatly divergent. Under Rule 64, F.R.C.P., the law of the forum will determine 'the circumstances and * * * manner' in which attachment is available. Thus it would control in respect to such matters, among others, as the type of claim warranting attachment, the bond and affidavit requirements, property exempted from attachment, and the circumstances under which property may be released from attachment.

327 F.2d at 310.

The Court is also persuaded by the reasoning set forth in *GM Gold & Diamonds, LP v*

Created by Neevia Document Converter trial version http://www.neevia.com

*Fabrege Co., Inc.*, 489 F.Supp.2d 725 (S.D. Tex. 2007), a case cited by Blixseth. In *GM Gold & Diamonds*, the District Court in the Southern District of Texas denied the plaintiff's motion for a writ of attachment against the defendant's New York property because the Texas statute did not address the "issue of extraterritoriality." *Id.* at 728-29. Montana's statute on prejudgment attachment, like the statute in Texas, does not address the issue of extraterritoriality. Absent an express intent by the Montana legislature, this Court declines to grant Plaintiff's request to attach personal property that is located in Nevada, or a state other than Montana.

The Plaintiff requests a prejudgment writ of attachment only as to Blixseth's interest in a Nevada limited liability limited partnership. The Plaintiff does not request a prejudgment writ of attachment as to any assets that Blixseth may still own in his name in Montana. Given the limited scope of the Plaintiff's request, the Court must deny the Plaintiff's request for a prejudgment writ of attachment.

Pursuant to the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED:

1. Plaintiff's Motion for Temporary Restraining Order filed November 20, 2009, at docket entry no. 49 is DENIED as moot.

2. Plaintiff's Motion for Preliminary Injunction filed November 20, 2009, at docket entry no. 49, is GRANTED; and a Preliminary Injunction is hereby issued against Defendant Timothy L. Blixseth restraining and enjoining Blixseth and Blixseth's agents, employees, and attorneys from doing the following:

> a. During the pendency of this Adversary Proceeding and until the time that final judgment is entered, Blixseth and any and all of Blixseth's agents,

Created by Neevia Document Converter trial version http://www.neevia.com

servants, employees, and attorneys are restrained and enjoined from spending, transferring, concealing, dissipating, encumbering, assigning, and/or hypothecating any and all of the assets held solely by Blixseth, or held by Blixseth along with one or more co-owners, with the total dollar value of Blixseth's assets so restrained by this Preliminary Injunction not to exceed, in the aggregate, $6 million worth of cash and/or non-cash assets together (with value of the assets to be determined by taking into account net equity in said assets only, after subtracting all liens and co-owner interests from fair market value of said assets).

  b. Blixseth's assets restrained and enjoined by this Preliminary Injunction include, but are not limited to, any and all bank accounts, certificates of deposit, brokerage accounts, and/or real property held by Blixseth (including such assets held by Blixseth's entities, such as Desert Ranch, LLLP and the entities thereunder).

3. Plaintiff's Application for Prejudgment Writ of Attachment filed January 27, 2010, at docket entry no. 130, is DENIED.

BY THE COURT

_Ralph B. Kirscher_
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

Created by Neevia Document Converter trial version http://www.neevia.com